Slip Op. 13-77

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————— :
                                                        :
JINXIANG YUANXIN IMPORT &            :
EXPORT CO., LTD.,                               :
                                                        :
            Plaintiff,                                  :
                                                        :
            v.                                           :
                                                        :
UNITED STATES,                                  :     Before: Richard K. Eaton, Judge
                                                        :
            Defendant,                              :     Court No. 11-00145
                                                        :
            and                                        :     **Public Version**
                                                        :
FRESH GARLIC PRODUCERS             :
ASSOCIATION, CHRISTOPHER        :
RANCH, L.L.C., THE GARLIC             :
COMPANY, VALLEY GARLIC, and     :
VESSEY AND COMPANY, INC.,         :
                                                        :
            Defendant-Intervenors.             :
———————————————————— :

## OPINION and ORDER

[Plaintiff's motion for judgment on the agency record is granted, in part, and the Department of Commerce's final determination rescinding plaintiff's new shipper review is remanded.]

Dated: June 18, 2013

*John J. Kenkel*, deKieffer & Horgan, of Washington, D.C., argued for plaintiff. With him on the brief were *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *George H. Kivork*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

*John M. Herrmann*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors. With him on the brief was *Michael J. Coursey*.

Eaton, Judge:  Before the court is the motion for judgment on the agency record, pursuant to USCIT Rule 56.2, of plaintiff Jinxiang Yuanxin Import & Export Co. ("plaintiff" or "Yuanxin"), an exporter of fresh, whole garlic from the People's Republic of China ("PRC"). By its motion, Yuanxin challenges the Department of Commerce's ("Commerce" or the "Department") rescission of its new shipper review under the antidumping duty order on fresh garlic from the PRC, after finding that Yuanxin's sole U.S. export was not a bona fide sale.  *See* Garlic From the PRC, 76 Fed. Reg. 19,322 (Dep't of Commerce Apr. 7, 2011) (rescission of antidumping duty new shipper reviews) ("Rescission"), and the accompanying Final Bona Fides Memorandum (Dep't of Commerce Mar. 31, 2011) ("Bona Fides Mem."); Fresh Garlic from the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994) (antidumping duty order) ("Order").  The period of review ("POR") was November 1, 2008 through October 31, 2009.

Yuanxin claims that "Commerce unlawfully rescinded the new-shipper review . . . [and that the] Department's determination with respect to the issue of whether Yuanxin's sale was *bona fide* was not supported by substantial evidence on the record and was otherwise contrary to law."  Pl.'s Mem. in Supp. of Mot. for J. on the Agency R. 1 (ECF Dkt. No. 34) ("Pl.'s Br"). Defendant United States ("defendant"), on behalf of Commerce, urges that the determination be sustained.  Def.'s Mem. in Opp. to Pl.'s Mot. for J. on the Agency R. 1 (ECF Dkt. No. 49) ("Def.'s Mem.").  Defendant-intervenors, the Fresh Garlic Producers Association and its individual members (Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.) ("defendant-intervenors"), argue that plaintiff's contentions are without merit, and that the court should sustain the determination in its entirety.  Def.-Ints.' Resp. in Opp. to Pl.'s Mot. for J. on the Agency R. 1 (ECF Dkt. No. 56) ("Def.-Ints.' Resp.").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, plaintiff's motion is granted, in part, and defendant's Rescission of Yuanxin's new shipper review is remanded.

## BACKGROUND

In 1994, Commerce issued an antidumping duty order on imports of fresh garlic from the PRC. Order, 59 Fed. Reg. at 59,209. Because Yuanxin, a new exporter, did not participate in the underlying antidumping investigation or in any prior administrative review, it is subject to the PRC-wide antidumping duty rate unless it can secure an individual rate through a new shipper review.

Yuanxin is a processor and exporter of garlic from the PRC that made one sale of single-clove[1] whole garlic into the United States during the POR.[2] Bona Fides Mem. at 4. Yuanxin sold its merchandise through a U.S. reseller[3] ("the Reseller") that had not formerly purchased garlic. Def.'s Mem. 3. The Reseller did not purchase any other garlic during or subsequent to the POR. Def.'s Mem. 4. The Reseller immediately transferred the garlic to a U.S. wholesaler[4]

---

[1]     Single-clove garlic (also known as solo garlic, monobulb garlic, single bulb garlic, or pearl garlic) has the same flavor as multi-clove garlic, but consists of a single clove per bulb, instead of multiple cloves. *See generally* MEREDITH, THE COMPLETE BOOK OF GARLIC: A GUIDE FOR GARDENERS, GROWERS, AND SERIOUS COOKS 294–95 (2008). It originates in Yunnan province in Southern China. *Id.*

[2]     The sale consisted of [[          ]] kilograms of single-clove garlic from the PRC with a total value of [[          ]] or a weighted-average unit value ("AUV") of [[     ]] per kilogram. Bona Fides Mem. at 4.

[3]     The U.S. reseller was [[                              ]], a sporting and athletic goods manufacturer. Bona Fides Mem. at 8.

[4]     The U.S. wholesaler was [[                              ]]. Bona Fides Mem. at 8.

("the Wholesaler") that had previously purchased single-clove garlic from another exporter during the preceding period of review.  Bona Fides Mem. at 8.

In November 2009, Commerce received a timely request for a new shipper review from Yuanxin.  *See* Fresh Garlic from The PRC (Nov. 25, 2009) (request for new shipper review) (P.R. Doc. 2; C.R. Doc. 2).  On January 5, 2010, the Department initiated new shipper reviews for three exporters of fresh garlic from the PRC, including Yuanxin.  Fresh Garlic From the PRC, 75 Fed. Reg. 343–44 (Dep't of Commerce Jan. 5, 2010) (initiation of new shipper reviews).

On November 12, 2010, Commerce issued its Preliminary Results, finding that it did not have a basis to conclude that Yuanxin's sale was not bona fide, and setting the company's dumping margin at $0.75 per kilogram.  Fresh Garlic From the PRC, 75 Fed. Reg. 69,415, 69,417, 69,422 (Dep't of Commerce Nov. 12, 2010) (preliminary results of new shipper reviews and preliminary rescission, in part) ("Prelim. Results"), and accompanying Preliminary Bona Fides Analysis Mem. at 5. ("Prelim. Bona Fides Mem.").  Also, in the Preliminary Results, however, "Commerce expressed its concern . . . that the [average unit value ("AUV")] of Yuanxin's sale was the [[          ]] AUV out of the [[          ]] Chinese entries," and that "Yuanxin's sale quantity was [[      ]] percent [[          ]] than the average quantity of all such entries."  Def.'s Mem. 5.  The Department "also expressed concern as to" the unusual nature of the Reseller's sale to the Wholesaler.  Def.'s Mem. 5.  Commerce therefore concluded that "given the concerns regarding the price, quantity, and atypicality of the product and transaction, we plan to continue to examine all factors relating to the bona fide nature of Yuanxin's sale throughout the remainder of this [new shipper review]."  Prelim. Bona Fides Mem. at 6.

After the Preliminary Results were issued, the Department sent a supplemental questionnaire to Yuanxin to solicit additional information about its sale and about the nature of single-clove garlic.  Rescission, 76 Fed. Reg. at 19,324.  Yuanxin submitted a response to the questionnaire and provided supplementary evidence concerning the bona fides of its sale.  Pl.'s Third Supp. Questionnaire Resp. (Feb. 14, 2011) (C.R. Doc. 46) ("Pl.'s 3d Resp.").  Additionally, information about single-clove garlic was placed on the record by plaintiff and by the Department.  Rescission, 76 Fed. Reg. at 19,324.

On April 7, 2011, after reviewing additional briefing from plaintiff and defendant-intervenors and the new record evidence, Commerce determined that Yuanxin's sale was not bona fide and rescinded the company's new shipper review.  Rescission, 76 Fed. Reg. at 19,324.  In the Rescission, Commerce concluded,

> [b]ased on the Department's complete analysis of all the information on the record of this review regarding the *bona fides* of Yuanxin's . . . sale, the Department finds Yuanxin's sale to be not *bona fide* because (1) Yuanxin's sale price is so high as to be commercially unreasonable and not indicative of future sales, (2) Yuanxin's sales quantity is not representative of the garlic industry, and (3) the structure of Yuanxin's U.S. sale is of an unusual nature.

Rescission, 76 Fed. Reg. at 19,324.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

## DISCUSSION

### I.    Legal Framework

Under 19 U.S.C. § 1675(a)(2)(B), Commerce shall, upon request, conduct administrative reviews "for new exporters and producers."  19 U.S.C. § 1675(a)(2)(B).  The purpose of these

new shipper reviews is to determine whether exporters or producers, whose sales have not been

previously examined, are (1) entitled to their own duty rates under an antidumping order, and (2)

if so, to calculate those rates.  *See Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT

603, 604, 374 F. Supp. 2d 1333, 1335 (2005).  When performing these new shipper reviews, "[i]t

is Commerce's practice . . . to determine whether the new exporters and producers have

conducted bona fide or commercially reasonable transactions."  *Shandong Chenhe Int'l Trading

Co. v. United States*, 34 CIT __, __, Slip Op. 10-129, at 5 (2010) (citing 19 C.F.R. §

351.214(b)(2) (2009); *Hebei New Donghua*, 29 CIT at 608, 374 F. Supp. 2d at 1338).  In doing

so, "Commerce normally employs a totality of the circumstances test to determine whether the

transaction is 'commercially reasonable' or 'atypical of normal business practices.'"  *Id.* at __,

Slip Op. 10-129, at 6 (quoting *Hebei New Donghua*, 29 CIT at 610, 374 F. Supp. 2d at 1339).

        To determine whether a sale is atypical of normal business practices, the Department will

look at all of the circumstances surrounding the sale.  *See Catfish Farmers of Am. v. United

States*, 33 CIT __, __, 641 F. Supp. 2d 1362, 1368 (2009) ("If the weight of the evidence

indicates that a sale is not typical of a company's normal business practices, the sale is not

consistent with good business practices, or 'the transaction has been so artificially structured as

to be commercially unreasonable,' the Department finds that it is not a bona fide commercial

transaction and must be excluded from review." (citation omitted)).

        "In evaluating whether or not a sale is 'commercially reasonable,' Commerce has

considered the following factors, among others: (1) the timing of the sale, (2) the price and

quantity[,] (3) the expenses arising from the transaction, (4) whether the goods were resold at a

profit, (5) and whether the transaction was at an arm's length basis."  *Hebei New Donghua*, 29

CIT at 610, 374 F. Supp. 2d at 1339 (citing *Windmill Int'l Pte., Ltd. v. United States*, 26 CIT 221,

228, 193 F. Supp. 2d 1303, 1310 (2002); *Am. Silicon Techs. v. United States*, 24 CIT 612, 616,

110 F. Supp. 2d 992, 995 (2000)).  When weighing these factors, Commerce's overarching goal

is to determine "whether the sale(s) under review are indicative of future commercial behavior."

*Hebei New Donghua*, 29 CIT at 613, 374 F. Supp. 2d at 1342; *see also Shandong Chenhe*, 34

CIT at __, Slip Op. 10-129, at 6; *Tianjin Tiancheng Pharm. Co. v. United States*, 29 CIT 256,

258, 366 F. Supp. 2d 1246, 1249 (2005).  In addition,

> [f]or Commerce, a primary indication that a sale (or series of sales) is not bona
> fide is evidence that the sales price is unusually high in comparison to the prices
> of other sales of subject merchandise during the POR.  Underlying this sales price
> inquiry is the idea that a respondent might arrange for a high sales price in order
> to avoid the imposition of a significant antidumping duty margin.[5]

*Zhengzhou Huachao Indus. Co. v. United States*, 37 CIT __, __, Slip. Op. 13-61, at 6–7

(2013) (citing *Jinxiang Chengda Imp. & Exp. Co. v. United States*, 37 CIT __, __, Slip

Op. 13-40, at 4–5 (2013)).


II.     **The Department's Use of the Customs Data in Its Price Analysis Was Not
        Supported by Substantial Evidence**

        Commerce began its analysis of Yuanxin's sale by examining the company's sales price

to its Reseller.  To this end, following the Preliminary Results, the Department placed on the

record a copy of the U.S. Customs and Border Protection ("Customs") data run containing all

entries of merchandise exported to the United States from the PRC during the POR under U.S.

---

[5]        An antidumping duty margin is "the amount by which the normal value exceeds
the export price or constructed export price of the subject merchandise."  19 U.S.C. §
1677(35)(A).  In other words, "[i]f the price of an item in the home market (normal value) is
higher than the price for the same item in the United States (export price), the dumping margin
comparison produces a positive number, indicating that dumping has occurred."  *Qingdao Sea-
line Trading Co., Ltd. v. United States*, 36 CIT __, __, Slip Op. 12-39, at 5 n.3. (2012).
Therefore, if a respondent is able to enter its merchandise at a high sales price, the difference
between the sales price and the price in the home market will be low, resulting in a low dumping
margin.

Harmonized Tariff Schedule ("HTSUS") category 0703.20.0010 for "Garlic, Fresh Whole

Bulbs," a category that includes both single-clove and multi-clove fresh, whole garlic bulbs.

Bona Fides Mem. at 4.  The Customs data yielded an AUV of [[         ]] per kilogram for the

[[         ]] entries under this HTSUS heading.  Bona Fides Mem. at 6.  Commerce then compared

Yuanxin's sales price of [[         ]] to the Customs AUV of [[         ]] and found that Yuanxin's

price was abnormally high because it was "more than [[         ]] times higher than the [Customs]

AUV, making its entry [[                              ]] under this HTSUS heading."  Bona Fides

Mem. at 6.

Plaintiff objects to the Department's comparison of the company's sales price for single-

clove garlic to the prices in the Customs data because those prices were for multi-clove garlic.

Yuanxin argues that this comparison departs from Commerce's "consistent policy" in other

reviews of not conducting comparisons with the Customs AUV when products are determined to

be unique.  Pl.'s Br. 12, 20–21.  In support of its position, plaintiff first cites to the review for

Jinxiang Hejia Co., Ltd. ("Hejia"), the only other review conducted for a sale of single-clove

garlic.  *See* Fresh Garlic from the PRC, 74 Fed. Reg. 50,952 (Dep't of Commerce Oct. 2, 2009)

(final results and final rescission, in part, of new shipper reviews), and accompanying Issues &

Decision Mem. ("*Hejia* Issues & Dec. Mem.").  In that review, Commerce determined that,

"[a]lthough Hejia's sale of single-clove garlic entered at a significantly higher price than the

AUV for [the other entries under the same tariff heading], this comparison may not be

meaningful for purposes of this bona fides analysis because [the tariff heading] includes

substantial entries of multi-clove garlic which, both parties concede, have prices significantly

lower than Hejia's price for single clove garlic."  *Hejia* Issues & Dec. Mem. at 4–5.  Based on

this finding, the Department disregarded its comparison of the sales price of Hejia's single-clove

garlic to the AUV of garlic entered under HTSUS 0703.20.0010.  Commerce relied instead on

the parties' concession, supported by record evidence of single-clove garlic prices, that prices for

single-clove garlic should be higher than those for multi-clove garlic.

Plaintiff further claims that Commerce used a similar "unique products" analysis in three

other administrative reviews—*Fish Fillets*, *Stainless Steel*, and *Wooden Bedroom Furniture*.

Pl.'s Br. 28–29.  In each of these reviews, the Department approved prices that were higher than

the average for the products entered under the same HTSUS heading.  The Department found

that the higher prices were justified because each product under review was distinct from the

remaining entries made under the same heading.  Yuanxin claims similar treatment, arguing that

"the AUV price in the Customs database is inappropriate [because] Yuanxin sold a product that

is at a level far above that of normal multi-clove garlic."  Pl.'s Br. 28.

In response, Commerce acknowledges that in the Preliminary Results it stated that the

distinction between single-clove and multi-clove garlic "le[d] us to deviate from our typical

procedure of relying on [Customs] data as a point of comparison for the new shipper's price."

Bona Fides Mem. at 6, 4 ("In the Preliminary Results, although all entries were made under the

same HTSUS number, the Department did not compare Yuanxin's sale to the POR AUV based

on the understanding at the time that single-clove garlic is distinct from multi-clove garlic, with

significantly different prices.").  Thus, for the Preliminary Results, Commerce noted that,

> [a]lthough Yuanxin's sale of single-clove garlic entered at a significantly different
> price than the AUV for [other entries in the Customs data], this comparison may
> not be meaningful for purposes of this bona fides analysis because [the HTSUS
> heading] includes substantial entries of multi-clove garlic . . . [and] there are no
> other U.S. prices of single-clove garlic on the record to compare with the sale in
> question.

Prelim. Bona Fides Mem. at 4–5.

After the Preliminary Results, however, "the Department . . . re-examined whether
Yuanxin's sale of single-clove garlic should be considered a sale sufficiently distinct from a sale
of multi-clove garlic for purposes of [the] bona fides analysis."  Bona Fides Mem. at 6.
Accordingly, Commerce requested additional information and briefing from the parties about
single-clove garlic, and placed new evidence about single-clove garlic on the record.  Plaintiff
was also asked to "describe the growing process of both single-clove garlic and multi-clove
garlic . . . [and] . . . highlight the differences between the two growing processes," and to address
whether "single-clove garlic a differen[t] species than multi-clove garlic."  Pl.'s 3d Resp. 3.

Plaintiff responded that "[s]ingle-clove garlic and multi-clove garlic are the same
species" and "[t]he growing process of single-clove garlic is the same [as] multi-clove garlic
except that the harvest timing of single-clove garlic is two months earlier than the multi-clove
garlic."  Pl.'s 3d Resp. 3.  Based on this response, the Department found "that there is no reason
on the record in this case to disregard its long-standing practice of examining [Customs]-derived
AUVs [for fresh, whole garlic bulbs] as the most appropriate representation of the price of
subject merchandise."  Bona Fides Mem. at 6.  In other words, in contrast to *Hejia* (where
Commerce found that it was reasonable that the sales price for Hejia's single-clove garlic was
much higher than the prices for entries of multi-clove garlic entered under the same HTSUS
heading), here the Department believes it had enough evidence to support a comparison between
Yuanxin's sales price and the Customs data for sales of other fresh, whole garlic bulbs, even
though those bulbs were multi-clove rather than single-clove.  Specifically, in this review,
Commerce found that (1) single- and multi-clove garlic are the same species; (2) the growing
process is the same except that single-clove garlic is harvested two months earlier; (3) the
physical differences, i.e., number of cloves, "does not affect the garlic bulb's ultimate end-use";

and (4) "there is no evidence on the record that the 'market' for single-clove-garlic in the United

States is distinct from the market for fresh whole garlic in general."  Bona Fides Mem. 6.

Therefore, the Department found it was reasonable to compare Yuanxin's U.S. sales price to the

prices for other entries of whole garlic from the PRC during the POR.

As to its departure from the analysis it performed for Hejia, the other shipper of single-

clove whole garlic during the previous POR, Commerce argues that "[i]n *Hejia*, Commerce

found that a comparison using the AUV for whole garlic . . . was not meaningful for purposes of

a *bona fides* analysis because both parties conceded that entries of multi-clove garlic had prices

significantly lower than Hejia's price for single-clove garlic."  Def.'s Mem. 30.  In contrast, here,

Commerce had record evidence that it claims demonstrates that single- and multi-clove garlic are

similar enough to allow a comparison between the prices of the two.  Therefore, unlike in *Hejia*,

the Department "did not need to depart from its typical methodology and use a range of prices as

it has done in cases when matching identical merchandise has been difficult."  Def.'s Mem. 30.

As to plaintiff's claim that Commerce should have employed the analysis in *Fish Fillets*,

*Stainless Steel*, and *Wooden Bedroom Furniture*, Commerce first counters that "to the extent that

Yuanxin relies upon Commerce's analysis of proprietary information contained in these reviews,

the Court should disregard Yuanxin's arguments [because t]hese memoranda and the proprietary

information contained therein are not available to the public and were not placed upon the record

of this case."  Def.'s Mem. 29.  Thus, Commerce urges the court to reject plaintiff's reliance on

the three administrative reviews, information about which is not available to the public, and

instead sustain Commerce's use of the Customs AUV.  Def.'s Mem. 29–32.

In addition, contrary to plaintiff's position, the Department argues that the three reviews

cited by plaintiff "demonstrate that Commerce's preference is to use the AUV derived from

[Customs] data, but that, in truly exceptional circumstances, Commerce may depart from its

longstanding practice." Def.'s Mem. 29. Here, the Department maintains that it "correctly

determined that such exceptional circumstances did not apply." Def.'s Mem. 29. According to

Commerce, this is because, unlike in *Hejia*, here there is no record evidence that indicates that

single-clove garlic is a "niche product," like the specialized steel product in *Stainless Steel*, "or

an import with multiple inputs or special 'physical characteristics.' Furthermore, the HTSUS

category used by Commerce covers only fresh whole garlic, and not a myriad of different

products as was the case in *Stainless Steel* and *Furniture*." Def.'s Mem. 31–32. Thus, the

Department asserts that "Commerce reasonably determined that it was not faced with a

complicated and unique product . . . that make[s] matching the new shipper's sales to the

Customs data problematic." Def.'s Mem. 32 (citing Bona Fides Mem. at 7–9).

### III.   Commerce Must Explain Its Departure from the Practice It Established in *Hejia*

As has been seen, the Department concluded that, when compared to the Customs AUV

of [[        ]], Yuanxin's sales price of [[          ]] was unusually high, and therefore indicative of

a non-bona fide sale. In addition, Commerce found that Yuanxin's sales price was not only high

when compared to the Customs AUV, but was actually the [[          ]] under either the whole or

peeled garlic category. Bona Fides Mem. at 6.

The court finds, however, that the use of this comparison is at odds with the

Department's practice established in *Hejia*,[6] and that the departure from this practice was not

adequately explained.  In *Hejia*, Commerce found that single-clove garlic was "unique" and

therefore a comparison with entries of multi-clove garlic was not appropriate.

> Commerce . . . concluded in the *Final Results* that Hejia's one-time sale was a
> bona fide commercial transaction.  In defending the relatively high price of its
> sale, Hejia argued that prices for single-clove garlic are significantly higher than
> those for multi-clove garlic.  To support its argument, Plaintiff placed on the
> record sales offers of single-clove garlic to Germany, Great Britain, and Japan, all
> for single-clove garlic at prices significantly higher than the multi-clove variety.
> Thus, the Department rejected the contention by Defendant-Intervenors . . . that
> Hejia's sale was not reflective of future sales and determined that the agency
> "[did] not have a basis for concluding that [Hejia's] price is aberrationally high
> for single-clove garlic in the United States."

*Jinxiang Hejia Co. v. United States*, 35 CIT __, __, Slip Op. 11-112, at 6 (2011) (citations

omitted).  Although the Department insists that it made its finding in *Hejia* that single-clove

garlic commands a higher price than multi-clove garlic based on the concession of the parties, it

is apparent from the passage quoted above that it also based its finding on record evidence.

---

[6]      Commerce may establish a new practice in a single review, provided that the
Department has adequately explained both why it is deviating from a former practice (if it had an
established practice), and why the new practice is appropriate.  *See Huvis Corp. v. United States*,
570 F.3d 1347, 1353 (Fed. Cir. 2009) (upholding this Court's decision that sustained the
Department's use of a new practice, stating "Commerce need only show that its methodology is
permissible under the statute and that it had good reasons for the new methodology.");
*Torrington Co. v. United States*, 68 F.3d 1347, 1356 (Fed. Cir. 1995) (upholding Commerce's
"new practice" of deducting indirect home-market transportation expenses from foreign market
value in cases in which United States price is calculated on the basis of exporter's sales price);
*Dorbest Ltd. v. United States*, 35 CIT __, __, 789 F. Supp. 2d 1364, 1370 (2011) ("Where
Commerce adopts a practice that substantially deviates from precedent, it must at least
acknowledge the change and show that there are good reasons for the new policy.  The new
practice must also be within the scope of authority granted to Commerce by the relevant
statute.") (citations omitted); *cf. AIMCOR v. United States*, 23 CIT 1000, 1012, 86 F. Supp. 2d
1248, 1259 (1999) ("Because these general policy statements do not set forth any reasons *why*
Commerce believed it appropriate to depart from its former practice, its allegedly new 'practice'
. . . , without more, cannot serve as a basis for refusing to [use the practice advocated by
plaintiffs].").

Having done so, in order to depart from the practice established in *Hejia*, the burden is on

Commerce to explain this departure. *See Mueller Comercial de Mexico, S. de R.L. de C.V. v.*

*United States*, 35 CIT __, __, 807 F. Supp. 2d 1361, 1367–68 (2011) ("[I]f the Department

chooses to depart from [its] practice it is required to provide a reasonable explanation for doing

so." (citing *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 459, 112 F. Supp. 2d 1141,

1148 (2000))); *PSC VSMPO-AVISMA Corp. v. United States*, 35 CIT __, __, 755 F.Supp.2d

1330, 1339 (2011). The Department has not provided an adequate explanation here. In other

words, the court finds that Commerce has failed to explain why it departed from its practice of

treating single-clove garlic as a product commanding a higher price than multi-clove garlic.

While Yuanxin itself provided some evidence that demonstrates that the two types of

whole garlic are similar, the Department did not address the question of whether single-clove

garlic commands a higher price than other types of garlic, and whether the pricing is affected by

the unique nature of the single-clove garlic. *See Hejia* Issues & Dec. Mem. at 5 ("[E]ntries of

multi-clove garlic . . . , both parties concede, have prices significantly lower than Hejia's price

for single clove garlic."). Although the Department cites its longstanding practice of comparing

the price of a newly-shipped product to the AUV of products entered under the same HTSUS

heading, it fails to acknowledge the practice it established in *Hejia*.

In its brief pricing discussion, the Department relies on its finding that there is no

evidence of a distinct market for single-clove garlic. Bona Fides Mem. 6. Commerce, however,

cannot rely on an absence of evidence of a niche market to overcome its obligation to follow its

past practice in which it found that single-clove garlic commands a higher price. *See, e.g.*, Bona

Fides Mem. at 6 ("[T]here is *no evidence on the record* that the 'market' for single-clove-garlic

in the United States is distinct from the market for fresh whole garlic in general." (emphasis

added)).  This is particularly the case because the Department made no effort to determine

whether there is a distinct market for single-clove garlic.  Thus, although Commerce issued a

supplemental questionnaire following publication of the Preliminary Remand Results, its

questions did not seek information relating to a distinct market for the single-clove variety.

Rather, Commerce's questions were confined to physical characteristics, growing processes, and

Yuanxin's reasons for "decid[ing] to purchase single-clove garlic."  Pl.'s 3d Resp. 2–3.

      Because the Department asked no questions about a separate market for single-clove

garlic, plaintiff was not alerted that it should place on the record information that would counter

the Department's conclusion that there was "*no evidence on the record* that the market for

single-clove garlic in the United States is distinct from the market for fresh whole garlic in

general."  Bona Fides Mem. at 6.  Thus, the Department's statement that the record contained no

niche market information is an inadequate explanation of its decision not to continue to use the

practice it established in *Hejia.*

      As to Commerce's claim that *Fish Fillets*, *Stainless Steel*, and *Wooden Bedroom

Furniture* cannot form the basis for an argument before the court because the bona fides

memoranda for these reviews were neither available to the public nor placed on the record in this

review, the court finds this claim unconvincing.  This Court has reviewed arguments based on

these three reviews in the past, and the availability of the underlying confidential memoranda

was not an impediment to its analysis.  *See Jinxiang Chengda*, 37 CIT at __, Slip Op. 13-40, at

11 ("In those reviews, according to plaintiff, Commerce found that the Customs data did not

provide a useful comparison because the products under review were unique, and thus not

comparable to the products represented by the Customs data, even though the unique products

fell under the same tariff heading as the other products in the data.").  Moreover, the Department

itself has fully described its reasons for the treatment accorded the products discussed in those reviews.  Therefore, plaintiff's arguments relating to these three reviews are not barred.

Finally, here, plaintiff placed at least some evidence on the record indicating that a niche market existed for single-clove garlic.  In particular, plaintiff provided Indian offer prices for single-clove garlic during the POR that reflected an average offer price of $1.28 per kilogram. Bona Fides Mem. at 5.  While lower than the sales prices at the high end of the Customs data, the average of the Indian offer prices is certainly higher than the AUV from the Customs data of [[        ]] per kilogram.  Thus, because it failed to make any effort to determine if there is indeed a distinct market for single-clove garlic, the Department has not adequately explained its departure from the practice it established in *Hejia*.  Therefore, the question must be remanded.

### IV.  The Department's Comparison Between Yuanxin's U.S. Sales Price & Its Third-Country Sales Was Not Supported by Substantial Evidence

As part of its sales price analysis, Commerce also compared Yuanxin's U.S. sales price to the prices for the sales the company made to third countries (i.e., other than to the United States) both during and after the POR.  In doing so, the Department found that, although "[t]he price of Yuanxin's U.S. sale mirrors the price of [its] third country sales of single-clove garlic during the POR . . . , after the POR, the prices of these third country sales dropped by [[        ]]."  Bona Fides Mem. at 5.  Based on these observations, Commerce found that, "[a]ssuming the price of Yuanxin's U.S. sales continued to mirror the price of its third country sales, Yuanxin's subsequent hypothetical post-POR U.S. single-clove garlic sales prices would then also decrease by [[        ]]."  Bona Fides Mem. at 5.  For this reason, Commerce concluded that "Yuanxin's POR sales of single-clove garlic do not appear to be a good indicator of future sales."  Bona Fides Mem. at 5.

Plaintiff objects to this conclusion, stating that "while Commerce found an apples-to-apples comparison of Yuanxin's sales to all markets in the [POR], it impermissibly made comparisons after the POR and then speculated that future Yuanxin prices to the U.S. would mirror the decline in price in third markets."  Pl.'s Br. 23.  Under the "best available information" framework,[7] according to plaintiff, "Commerce [should] reject any analysis outside Yuanxin's POR since it has third-country data within the POR."  Pl.'s Br. 23.

In response, defendant counters that "Commerce put the subject sale within the context of Yuanxin's normal established business practice with this third-country customer."  Def.'s Mem. 23.  Furthermore, Commerce's goal in a new shipper review is to determine "whether the sale(s) under review are indicative of future commercial behavior."  *Hebei*, 29 CIT at 613, 374 F. Supp. 2d at 1342.  Therefore, the Department argues that it was "entirely appropriate for Commerce to compare Yuanxin's third-country sales price of [[          ]] during the [POR] with its sales price of [[          ]] to this same country after the [POR], and to determine that the drop in price for Yuanxin's third-country sales demonstrated that Yuanxin's sales during the [POR] were not reliable indicators of future prices."  Def.'s Mem. 23.  In other words, because the prices for plaintiff's sales to third countries dropped significantly after the POR, Commerce concluded that

---

[7]       The "best available information" framework is part of Commerce's surrogate valuation analysis conducted to determine whether merchandise is being, or is likely to be, sold at less-than-fair value.  *See* 19 U.S.C. § 1677b(c)(1) (directing Commerce, when calculating normal value, to value the factors of production "based on the best available information regarding the values of such factors in a market economy country").  Thus, it is not part of the Department's bona fides sales framework, which relies on a "totality of the circumstances" analysis.  *See* Def.-Ints.' Resp. 23 ("Yuanxin argues that Commerce is compelled to rely on the 'best information available' in reaching its determinations, and that Commerce should limit its analysis to information that is specific to the POR.  Those arguments, however, are not consistent with Commerce's well-established practice of considering the 'totality of the circumstances' of a transaction in evaluating its *bona fides*." (citations omitted)).  Therefore, it is unclear why plaintiff grounds its arguments in the "best available information" framework.

Yuanxin's U.S. sales prices would not remain constant following the POR because future prices would "mirror" Yuanxin's third-country sales and thus decline as well.

With respect to Commerce's methodology, this Court has often affirmed the procedure of considering a plaintiff's third-country sales as one part of its bona fide analysis.  *See, e.g., Shandong Chenhe*, 34 CIT at __, Slip Op. 10-129, at 17–18; *Hebei New Donghua*, 29 CIT at 615, 374 F. Supp. 2d at 1343; *Tianjin Tiancheng*, 29 CIT at 269, 366 F. Supp. 2d at 1258 ("[T]hird-country sales were relevant to the determination and demonstrated that Plaintiff had priced the product in a manner more reflective of the AUV data during the POR.").

As to the facts presented here, Commerce compared the third-country sales prices to Yuanxin's U.S. sales price and found that they were comparable during the POR.  It then reasoned that Yuanxin's sales prices to the United States would decrease in the future because they would continue to mirror those of its third-country sales.  While Commerce's analysis of Yuanxin's third-country sales was reasonable, its conclusion that Yuanxin's future pricing would necessarily follow that of its third-country sales borders on conjecture.  That is, it was reasonable to compare Yuanxin's U.S. sales price of [[          ]] to its third-country sales price of [[         ]] and to conclude that they were roughly comparable during the POR.  The record, however, is bare of evidence indicating that these prices are tied together such that they will rise or fall proportionally in the future.

Moreover, even if the Department's conclusion that prices would drop proportionally was justified, Commerce's purpose in a new shipper review is not to establish a sales price that will remain constant.  Rather, using its totality of the circumstances analysis, the Department's purpose is to determine whether the transaction or transactions under review are commercially reasonable and thus indicative of future commercial behavior.  Here, there is nothing on the

record suggesting that the post-POR third-country sales were other than commercially

reasonable.  Thus, standing alone, the Department's prediction that "Yuanxin's subsequent

hypothetical post-POR U.S. single-clove garlic sales prices would then also decrease by

[[          ]]" says nothing about the commercial reasonableness of plaintiff's sale during the

POR, nor does it say anything about the commercial reasonableness of future sales, even if they

are made at a lower price.  Bona Fides Mem. at 5.  Thus, Commerce's unconvincing third-

country sales analysis is not supported by substantial evidence, nor is it sufficiently probative to

be considered as part of the Department's totality of the circumstances analysis.  On remand,

however, the Department shall take into account its third-country sales price comparison, which

shows that Yuanxin's third-country sales were at a relatively high price that was roughly equal to

its U.S. sales price.

## V.      Other Aspects of Commerce's Analysis

Because decisions with respect to certain other aspects of the Department's finding that

Yuanxin's price was abnormally high will depend on the remand results, the court will reserve

on their consideration until the review of those results.  In like manner, questions concerning

Commerce's finding that plaintiff's sole entry was of an unusually small quantity will be

reviewed following remand because only then will it be known whether the quantity comparison

was valid.

## VI.     The Department's Determination That the Nature of Yuanxin's Sale Was Atypical Was Supported by Substantial Evidence

Although the Department's findings as to Yuanxin's sales price and quantity will be

affected by the remand results, Commerce's findings concerning the nature of the garlic sale

need not wait.  As the final part of Commerce's bona fide analysis, the Department examined the

nature of Yuanxin's transaction. Bona Fides Mem. at 8. In the Preliminary Results, "the

Department noted that Yuanxin sold [its] single-clove garlic to [the Reseller] who then resold it

to [the Wholesaler], . . . but that Yuanxin had not provided price or quantity information on the

resale transaction between [the Reseller] and [the Wholesaler]." Bona Fides Mem. at 8. After

the Preliminary Results, however, the Department received additional information regarding both

of the transactions which "the Department finds indicative that Yuanxin's sale was atypical of

normal business practices." Bona Fides Mem. at 8.

      In particular, the Reseller "provided additional information regarding the details of its

sale of subject merchandise to [the Wholesaler]" and reported that the Reseller "had no prior

experience in the garlic industry . . . but that it wanted to get into the business of trading garlic."

Bona Fides Mem. at 8. Indeed, the Reseller was a sporting and athletic goods manufacturer.

The Department also found that the Wholesaler, the company that ultimately received the garlic,

"is the same company that purchased [[                                                     ]] [during the prior

POR and] . . . that [the Wholesaler], an importer with at least some prior experience as an

importer of single-clove garlic specifically . . . contacted [the Reseller] in the early summer of

2009 so that it might find an exporter of single-clove garlic." Bona Fides Mem. at 8.

Furthermore, here Yuanxin itself acted as the importer of record, and the Reseller's only

connection with the transaction was "that it took possession of the garlic upon arrival at the port.

After paying for the ocean freight, [the Reseller] reported that it released the bill of lading to [the

Wholesaler] . . . [and] that it is unable to provide further information on the shipment after the

release of the bill of lading." Bona Fides Mem. at 8. In an attempt to explore the issues

surrounding the second sale from the Reseller to the Wholesaler, the Department issued a

questionnaire to the Wholesaler, but the Wholesaler did not respond. Bona Fides Mem. at 8.

Based on the information submitted by the Reseller, Commerce found it "highly unusual that [the Wholesaler], a company with previous experience not only [[

]] from the PRC, but also participating in antidumping proceedings before the Department,[8] would seek out a company with no experience whatsoever in the garlic industry to locate a PRC supplier."  Bona Fides Mem. at 8.  In addition, while the Wholesaler had acted as the importer of record for its previous [[                                                         ]], in this review the Wholesaler asked the Reseller "to act as its intermediary to import the subject merchandise into the United States."  Bona Fides Mem. at 8.  Because the Wholesaler did not respond to its questionnaire, however, "the Department [was] unable to determine why [the Wholesaler] decided to structure its purchase of single-clove garlic in this manner, which so clearly differs from its [[                                                       ]]."  Bona Fides Mem. at 8; Bona Fides Mem. at 9 ("[The Wholesaler's] failure to provide information makes it impossible for the Department to fully explore whether the circumstances of Yuanxin's sale were typical of normal business practices or otherwise commercially reasonable.").  Hence, while Commerce stated that it "lacks any understanding of why [the Wholesaler] would choose to import through [the Reseller]," it found that "[t]he structure of Yuanxin's [new shipper review] sale . . . is unusual, and apparently inefficient, in light of [the Wholesaler's] previous [[

]]."  Bona Fides Mem. at 9.

Yuanxin objects to this conclusion.  First, plaintiff insists that "[t]here is no nexus between Yuanxin and [the Wholesaler].  Presumably, Yuanxin and [the Wholesaler] did not know each other, since [the Wholesaler] ask[ed] [the Reseller] to find a supplier in China of single-clove garlic.  Thus, Yuanxin had no role in [the Reseller] selling to [the Wholesaler]."

---

[8]     In particular, the Wholesaler participated in the [[
]] before Commerce.  Bona Fides Mem. at 8.

Pl.'s Br. 31.  For this reason, "Yuanxin's sale is the only one for which it can take responsibility

and which Commerce can appropriately analyze," and "Commerce provides no authority to

support its decision that it can ignore the sale by the exporter, and go downstream to analyze

subsequent sales."  Pl.'s Br. 32–33.

        Further, plaintiff contends that "Commerce cites not a single objection to the sale

between Yuanxin and [the Reseller].  The silence is deafening concerning this transaction. . . .

The record is clear: there is no evidence on the record even remotely suggesting that Yuanxin's

sale to [the Reseller] was anything less than normal."  Pl.'s Br. 32.  Therefore, according to

plaintiff, "[s]ince Commerce's concern is only with the second transaction between [the

Reseller] and [the Wholesaler], its decision was not based on substantial evidence on the record

and not reasonabl[y] determined."  Pl.'s Br. 3.

        In response, defendant argues that "Yuanxin does not reference record evidence to

support its conclusions regarding the relationship between Yuanxin and [the Wholesaler]; it

states only that, given the nature of the sales transactions, '[p]resumably, Yuanxin and [the

Wholesaler] did not know each other.'"  Def.'s Mem. 38 (quoting Pl.'s Br. 31).  Additionally,

relying on *Hebei* and *Chenhe*, defendant points out that "this Court has affirmed Commerce's

examination of the downstream customer's behavior and commercial transactions—

circumstances that are beyond the scope of the United States sales in question—in Commerce's

bona fides analysis."  Def.'s Mem. 38 (citing *Hebei*, 374 F. Supp. 2d at 1343–44; *Shandong

Chenhe*, 34 CIT at __, Slip Op. 10-129, at 6).

        As to plaintiff's contention that Commerce did not find anything objectionable about the

first sale (i.e., that between Yuanxin and its U.S. customer, the Reseller), Commerce counters

that it did, in fact, identify issues with Yuanxin's sale to the Reseller: "Commerce found the

structure of Yuanxin's sale to [the Reseller] to be 'unusual' and 'inefficient, in light of [the

Wholesaler's] previous [[                                                      ]].'"  Def.'s Mem. 38 (quoting Bona Fides

Mem. at 9); Def.-Ints.' Resp. 31 ("Yuanxin's assertion that 'there is no evidence on the record

even remotely suggesting that Yuanxin's sale to [the Reseller] was anything less than normal' is

contradicted by the Department's <u>Final Bona Fides Memo</u>.  In particular, the Department's

analysis highlights the unusual circumstances whereby [the Reseller] (a company that 'had no

experience in the garlic industry' at the time it began interacting with Yuanxin) was approached

by [the Wholesaler] (a company 'with previous experience not only [[

]] from the PRC, but also participating in antidumping proceedings before the

Department') to identify a supplier.  Thus, the Department's analysis clearly does identify

unusual circumstances in the Yuanxin to [the Reseller] transaction, both when analyzed

individually as well as when analyzed in relation to [the Wholesaler's] [[

]].") (citations omitted).

     Additionally, the Department points out that Yuanxin, and not the Reseller, acted as the

importer of record, "and that [the Reseller] acted as a middleman between an established

exporter [(Yuanxin)] and an experienced importer [(i.e., the Wholesaler)], even though [the

Reseller] had no previous experience in the garlic industry."  Def.'s Mem. 38–39.  Hence, "[i]t

was the entire series of events, including Yuanxin's sale to [the Reseller] and [its] particular role

in the importation and sale of the garlic, that called into question the nature of the transaction."

Def.'s Mem. 39.  Therefore, according to Commerce, "[i]t was . . . reasonable for Commerce to

find that, considering the experiences of the companies involved in the transaction, the evidence

in totality indicates that the sale was not based on normal business practices."  Def.'s Mem. 39.

Commerce has the authority to consider a variety of factors in determining whether a

transaction is commercially reasonable.  *See Hebei New Donghua*, 29 CIT at 616–17, 374 F.

Supp. 2d at 1343–44 (sustaining Commerce's consideration of a customer's post-sale behavior);

*Windmill*, 26 CIT at 231–32, 193 F. Supp. 2d at 1313–14.  To prevent an exporter from unfairly

benefitting from an atypical sale to obtain a low dumping margin, Commerce may review any

relevant evidence that suggests that a U.S. sale was commercially unreasonable or atypical of

future business practice.  *See Tianjin Tiancheng*, 29 CIT at 260, 366 F. Supp. 2d at 1250.

Therefore, plaintiff's assertion that "Yuanxin's sale is the only one . . . which Commerce can

appropriately analyze" is incorrect.  In other words, it was entirely within Commerce's authority

to consider the sale between the Reseller and Wholesaler as one aspect of its bona fide analysis.

Furthermore, as noted, plaintiff is also incorrect that Commerce found no issues with the

sale between Yuanxin and the Reseller.  Indeed, even in the Preliminary Bona Fides

Memorandum, the Department was concerned with the structure of Yuanxin's sale.  Prelim.

Bona Fides Mem. at 5–6.  Thus, the peculiar circumstances presented here could be considered

by Commerce in its totality of the circumstances analysis, and it was not unreasonable for

Commerce to find that the sales arrangement involved here was atypical.  Indeed, Yuanxin does

not attempt to explain why a sporting goods manufacturer acted as a middleman for its sale to the

Wholesaler, a company that had previously purchased single-clove garlic directly from Hejia.

Therefore, the court finds reasonable Commerce's conclusion that the circumstances surrounding

Yuanxin's sale were "atypical of normal business practice."

## **CONCLUSION and ORDER**

In sum, the Department has not explained its departure from the practice it established in

*Hejia* and has not supported with substantial evidence its determination that it was appropriate to

compare Yuanxin's sales price and quantity for its single-clove garlic to the sales prices and

quantities for multi-clove garlic in the Customs data.  In addition, while Commerce's analysis of

Yuanxin's third-country sales was reasonable, its conclusion about Yuanxin's future pricing

based on these third-country sales was not reasonable, nor was it supported by substantial

evidence.  The Department, however, reasonably considered the nature of Yuanxin's transaction

as part of its totality of the circumstances analysis.  Its conclusion that the circumstances

surrounding Yuanxin's transaction were atypical of normal business practices and indicative of a

non-bona fide sale was supported by substantial evidence.

    For the foregoing reasons, it is hereby

    ORDERED that plaintiff's motion for judgment on the agency record is granted, in part,

and Commerce's final determination rescinding plaintiff's new shipper review is remanded; it is

further

    ORDERED that, on remand, Commerce shall issue a redetermination that complies in all

respects with this Opinion and Order, is based on determinations that are supported by

substantial record evidence, and is in all respects in accordance with law; it is further

    ORDERED that, on remand, if Commerce wishes to rely upon a comparison of

Yuanxin's sales price to the AUV from the Customs data, it must explain its departure from the

practice it established in *Hejia*, and demonstrate with substantial evidence (1) that Yuanxin's

single-clove garlic is not a unique product when compared to multi-clove garlic, (2) that there is

not a distinct market for single-clove garlic, and (3) that factors relating to product uniqueness

and distinct market do not affect the price that single-clove garlic commands.  In addition, the

Department shall take into account plaintiff's arguments relating to *Fish Fillets*, *Stainless Steel*,

and *Wooden Bedroom Furniture*, as well as the evidence relating to the relatively high offer

prices for single-clove garlic in India and the high prices for plaintiff's third-country sales; it is

further

ORDERED that, in the event that a comparison of Yuanxin's sales price to the AUV

from the Customs data is found invalid, the Department must use another methodology to

determine the commercial reasonableness of Yuanxin's sales price; it is further

ORDERED that the Department determine, based upon the methodology used for its

price analysis, a reasonable methodology for examining the quantity of Yuanxin's sale; it is

further

ORDERED that, regardless of the sales price determination it reaches, Commerce must

support with substantial evidence its sales quantity findings; it is further

ORDERED that the Department shall reopen the record to solicit information regarding

whether single-clove garlic is a unique product, whether there is a distinct or specialized market

for single-clove garlic, and whether these facts affect the price that single-clove garlic

commands; it is further

ORDERED that the Department may reopen the record to solicit information for any

other purpose; it is further

ORDERED that the remand results shall be due on September 10, 2013; comments to the

remand results shall be due thirty (30) days following filing of the remand results; and replies to

such comments shall be due fifteen (15) days following filing of the comments.


                                          _____
                                                   /s/ Richard K. Eaton
                                                  Richard K. Eaton


Dated: June 18, 2013
          New York, New York